DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Michael Donaldson ("Donaldson"), appeals from the decision of the Summit County Court of Common Pleas. This Court affirms.
 I. {¶ 2} In 2000, Donaldson began a relationship with the victim, Laura Roberts ("Roberts"). They lived together until April of 2006. On May 9, 2006, Roberts obtained a civil protection order, which prohibited Donaldson from having any contact with her. In May of 2006, Donaldson was arrested and convicted for domestic violence against Roberts and violation of a protection order. He was sentenced to Oriana House. On July 16, 2006, Donaldson was again charged with violating a protection order after calling Roberts twice at her home. In January of 2007, Roberts filed a report against Donaldson for allegedly entering her home. On January 13, 2007, Donaldson called Roberts. After a probation violation hearing, Donaldson was found guilty of violating his probation and sentenced to eight months in prison. Before *Page 2 
Donaldson was released from prison, Roberts obtained a five-year extension on the civil protection order and had a home alarm system installed.
 {¶ 3} On August 20, 2007, Roberts called the police after seeing Donaldson on her property. On September 6, 2007, Donaldson was indicted on one count of violating a protection order, a fifth degree felony, in violation of R.C. 2919.27. On September 25, 2007, a supplemental indictment was filed, charging Donaldson with another count of violating a protection order, a third degree felony, in violation of R.C. 2919.27, and one count of menacing by stalking, a fourth degree felony, in violation of R.C. 2903.211(A). Donaldson pled not guilty to the charges, and on November 14, 2007, the matter proceeded to a jury trial. The jury found Donaldson guilty on all three counts. Donaldson was sentenced to a total of two years of incarceration. Donaldson timely appealed his convictions, raising three assignments of error for our review. We have combined some of his assignments of error to facilitate our review.
 ASSIGNMENT OF ERROR I "THE VERDICT OF THE TRIAL COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE SINCE THE STATE OF OHIO FAILED TO PROVE EACH AND EVERY ELEMENT OF THE CRIME[S] OF VIOLATING A PROTECTION ORDER AND MENACING BY STALKING BEYOND A REASONABLE DOUBT."
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED WHEN IT OVERRULED A TIMELY DEFENSE MOTION FOR ACQUITTAL PURSUANT TO CRIMINAL RULE 29 AS THERE WAS NOT SUFFICIENT EVIDENCE PRESENTED BY THE STATE OF OHIO TO ESTABLISH A PRIMA FACIE CASE OF VIOLATING A PROTECTION ORDER AND MENACING BY STALKING TO WARRANT THE CASE BEING SUBMITTED TO THE JURY."
 {¶ 4} In his first two assignments of error, Donaldson contends that his convictions for violating a protection order and menacing by stalking were based on insufficient evidence and against the manifest weight of the evidence. We do not agree. *Page 3 
 {¶ 5} Crim. R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal by authority of Crim. R. 29(A) if the record demonstrates "that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt." State v. Wolfe (1988), 51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. Id.
 {¶ 6} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). Further
 "[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency. Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2.
 {¶ 7} Therefore, we will address Donaldson's claim that his convictions were against the manifest weight of the evidence first, as it is dispositive of his claim of insufficiency.
 {¶ 8} A determination of whether a conviction is against the manifest weight of the evidence does not permit this Court to view the evidence in the light most favorable to the State to determine whether the State has met its burden of persuasion. State v. Love, 9th Dist. No. 21654,2004-Ohio-1422, at ¶ 11. Rather,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be *Page 4 
reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 9} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 10} Menacing by stalking is defined under R.C. 2903.211, and states in relevant part: "(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." Menacing by stalking is a fourth degree felony if "[t]he offender previously has been convicted of or pleaded guilty to a violation of this section or a violation of section 2911.211 of the Revised Code." R.C. 2903.211(2)(a). "Pattern of conduct" is defined, in relevant part, as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1).
 {¶ 11} Pursuant to R.C. 2919.27(A)(1), "[n]o person shall recklessly violate the terms of * * * [a] protection order issued or consent agreement approved pursuant to section 2919.26 or 3113.31 of the Revised Code[.]" Further, "[w]hoever violates this section is guilty of violating a protection order." R.C. 2919.27(B)(1). Donaldson was charged with two counts of violating a protection order. Count one was a fifth degree felony, as Donaldson had previously been convicted of violating R.C. 2919.27. R.C. 2919.27(B)(3). Count two was a third degree felony because Donaldson was violating a protection order while committing the offense of menacing by stalking. R.C. 2919.27(B)(4).
 {¶ 12} Donaldson contends that the two counts of violating a protection order should have been merged. Initially, we point out that this argument violates the appellate rules. Donaldson has failed to separately assign this argument as error and has failed to support his argument with citations to the record and case law, in violation of App. R. 16(A)(7). Accordingly *Page 5 
we may disregard this portion of Donaldson's argument. App. R. 12(A)(2). Drafting error aside, we find that Donaldson did not object to this issue at trial, and therefore, has forfeited this issue on appeal. Typically, if a party forfeits an objection in the trial court, reviewing courts may notice only "[p]lain errors or defects affecting substantial rights[.]" Crim. R. 52(B). Pursuant to Crim. R. 52(B), a plain error or defect that affects a substantial right may be noticed although it was not brought to the attention of the trial court. "A plain error must be obvious on the record, such that it should have been apparent to the trial court without objection." State v. Kobelka (Nov. 7, 2001), 9th Dist. No. 01CA007808, at *2, citing State v. Tichon (1995),102 Ohio App.3d 758, 767. As notice of plain error is to be taken with utmost caution and only to prevent a manifest miscarriage of justice, the decision of a trial court will not be reversed due to plain error unless the defendant has "established that the outcome of the trial clearly would have been different but for the alleged error." Kobelka, supra, at *2, citing State v. Waddell (1996), 75 Ohio St.3d 163, 166, andState v. Phillips (1995), 74 Ohio St.3d 72, 83. The State argues that because the trial court sentenced Donaldson to concurrent sentences, he cannot demonstrate plain error. The State cites to our recent decision in State v. Baker, 9th Dist. No. 23840, 2008-Ohio-1909, to support this argument. In that case we noted that we have previously held that "plain error does not exist when concurrent sentences are imposed for crimes that constitute allied offenses of similar import." (Internal citations and quotations omitted.) Id. at ¶ 31. As such, we find that Donaldson has failed to demonstrate prejudice. Even if the trial court erred by failing to merge the two counts, "his sentence would remain the same as the sentence was run concurrently, not consecutively, with the rest of the sentence." Id. We recognize that we recently certified this issue as a conflict to the Ohio Supreme Court. However, until the Ohio *Page 6 
Supreme Court speaks to the issue, the doctrine of stare decisis requires that we follow our case precedent.
 {¶ 13} Specifically, Donaldson was charged with two counts of violating a protection order with regard to an incident that occurred on August 20, 2007. Roberts testified that she and Donaldson had had a relationship. She identified him in court. According to Roberts, the couple lived together from the summer of 2000 to April of 2006. Roberts testified that after their breakup, Donaldson informed her that he would not leave the house and that "`You'll have to get the police involved.'" She then identified the civil protection order ("CPO") that she obtained on May 9, 2006. That CPO was in effect until May 9, 2007. On May 17, 2006, Roberts filed charges against Donaldson after he approached her home and attempted to force her inside. Roberts testified that as she tried to run away, Donaldson followed her, grabbed her and pushed her into the house. After a physical fight in the house, Roberts testified that she was able to talk him into leaving on the condition that she would not call the police. After Donaldson left, she called the police. The jury was shown photographs of her injuries from that day. As a result of the incident, Donaldson was found guilty of violation of the civil protection order. Donaldson was sentenced to 70 days at Oriana House.
 {¶ 14} Roberts testified that on July 15, 2006, she returned to her home in Akron from a trip to Cincinnati. Roberts stated that she "immediately knew that someone had been in the house. There were footprints in my carpet, and things had been moved in the house. A picture had been removed from the mirror in my bedroom." According to Roberts, Donaldson called her that night and eventually admitted that he had been in her home. Roberts reported the incident to the police. Roberts stated that Donaldson told her that he could get into her house any time he wanted. As a result of the phone call, Donaldson pled guilty in the Summit County Court of *Page 7 
Common Pleas to violating a protection order, in violation of R.C. 2919.27. The trial court accepted Donaldson's plea, and sentenced him to 18 months of community control. The trial court ordered Donaldson to have no contact with Roberts.
 {¶ 15} Roberts further testified that on January 13, 2007, Donaldson called her. Roberts hung up and called the police. Roberts stated that she called the police because "he had violated the protection order." She explained that she felt "[violated. I felt that this had been going on for a long time and it still wasn't over." Soon thereafter, Donaldson was found guilty of violating the terms of his community control. Donaldson was sentenced to eight months of incarceration. Roberts testified that prior to going to court for this incident, she arrived home to find her current boyfriend's clothes in an outside trash can, soaked in bleach. She again called the police. Roberts stated that at the beginning of May she obtained an order from the court extending the CPO to five years. It was also modified so that Donaldson could no longer have visitation with their dogs. Roberts testified that the CPO expires in 2012.
 {¶ 16} Roberts explained that while Donaldson was incarcerated, she nailed her windows shut. Further, Roberts stated, on August 10, 2007, she had an alarm system installed at her home. Roberts stated that she had the alarm installed because she was afraid of Donaldson, "I am afraid — I don't know what he could — I mean, he could hurt me. He could rape me, violate me. He could kill me." Roberts stated that at around 8:00 p.m. on August 20, 2007, her alarm went off. She explained that when the alarm went off, she went downstairs and found that the sensor by the garage door had been activated. She looked outside and saw Donaldson at the back door. She stated that she watched Donaldson go down the back stairs, into the backyard and then behind the garage. Roberts testified that she looked out another window and saw Donaldson walk by the side of her house then walk along the road. Roberts testified that she was on the *Page 8 
phone with 911 as she watched Donaldson. When the police arrived, they were unable to locate Donaldson in the area.
 {¶ 17} On cross-examination, Roberts testified that during the July 15, 2006 phone call, Donaldson told her that "`[i]f we're not friends, we're enemies,'" and that she would regret it, and then made other threats. She further testified that after the CPO was issued, she had talked and met with Donaldson on several occasions. She explained that she had hoped they could be friends and resolve the issue.
 {¶ 18} On redirect examination, the State asked Roberts what specific statements Donaldson had made to her that made her fearful. She stated "[h]e has said things that if we're not friends, we're enemies; that I will regret it; that he'll always be able to get into the house; that if he can't have me, no one can." She further stated that Donaldson informed her that he had her social security number and that he would ruin her life.
 {¶ 19} Akron Police Officer Eric Wood testified that he responded to Roberts' home on August 20, 2007. According to Wood, he was responding to a call about a suspicious person in the yard and because an alarm had gone off. When he arrived, another officer was there and informed him that the suspect had left the premises. Officer Wood then went door-to-door to find witnesses. According to Woods, he searched for the suspect for approximately 20 minutes. He did not locate the suspect.
 {¶ 20} Akron Police Officer Patrick Armstead testified that he had responded to Roberts' home on July 16, 2006 with regard to the phone call that Donaldson had made to her. As a result, Armstead testified, Roberts signed charges of a violation of a protection order with a prior conviction. According to Armstead, "I discerned that on the prior occasion [Donaldson] had been convicted of violating that same protection order with Miss Roberts being the victim." *Page 9 
Armstead testified that he also responded to Roberts' home on August 20, 2007. Armstead testified that when he heard the call on August 20, 2007, he remembered having been at the address on July 16, 2006. Armstead testified that in response to Roberts' request, he would check her home at least once a week. He testified that on a "very frequent basis on the nights that I worked I went by her house, checked the back yard, checked around her property to make sure no on was at her house." Upon arriving at Roberts' home on August 20, 2007, Armstead saw no foot traffic. He testified that Roberts was very excited and crying when she answered the door. He testified that Roberts told him that Donaldson had been there and that he had been at the back door. Armstead stated that Roberts informed him that she saw Donaldson at the back door and then saw him walking off the deck. She explained to Armstead that she did not see his face at that point. It was not until Donaldson turned to go behind the garage that Roberts saw his face. Armstead testified that he did not collect any fingerprints or DNA evidence because the back doorknob was wet with rain, and he could not collect fingerprints in the rain. Armstead took Roberts to the police station where she signed charges against Donaldson.
 {¶ 21} City of Akron Police Officer Jason McKeel testified that he responded to Roberts' home on January 13, 2007. According to McKeel, Roberts filled out a witness statement form, went to the police station, and signed a warrant against Donaldson. McKeel testified that Donaldson had had a prior conviction for violation of the CPO.
 {¶ 22} In his case-in-chief, Donaldson presented the testimony of Jasmine Mattocks ("Mattocks"). Mattocks testified that she went to college with Donaldson. According to Mattocks, she and Donaldson have been friends since 1998. "To me, he's a good character. I have nothing bad to say about him." Mattocks testified that Donaldson was dating her roommate, Trinette Black ("Black"), in August of 2007. According to Mattocks, Donaldson was *Page 10 
at her home on August 20, 2007. She testified that he left around 5:00 p.m., but that he returned with Black at around 10:00 p.m. Mattocks testified that she had previously been in prison for passing bad checks and bank laundering. She further testified that she did not know what Donaldson was doing between the hours of 5:00 p.m. and 10:00 p.m. but she knew that he was with Black because she had talked to them on the phone. She then clarified that she spoke with Black on the phone, but that she did not speak with Donaldson. On cross examination, Mattocks testified that she was in prison from May of 2006 to January of 2007. She further confirmed that she was convicted of forgery in 2003 and in 1998 was convicted of felony receiving stolen property. Mattocks further testified that Donaldson has a good character. When asked about Donaldson's previous convictions regarding aggravated trespass, menacing and criminal trespass, Mattocks stated that she was unaware of the past convictions, but that she had heard of the July 16, 2006 incident with Roberts. Mattocks testified that although she knew Donaldson was in jail, she did not attempt to communicate with the prosecutor or the police officers to inform them that she had been with him on the night in question. She testified that she did not come forward until Donaldson's attorney called her and asked her to. Mattocks testified that she loved Donaldson and that she thought Roberts "caused a lot of drama."
 {¶ 23} Black also testified on Donaldson's behalf. She stated that she met Donaldson in 2007 through Mattocks. She testified that their relationship had "just proceeded to become serious" in August of 2007. She testified that the only time she was not with Donaldson was when she went to work. She stated that on August 20, 2007, Donaldson drove her to and from work. She testified that while she was working, Donaldson went back to her home to wait with Mattocks. After work, Donaldson and Black went back to Black's home where they stayed for a short time. They then went to pick up Black's child at day care and then returned home. That *Page 11 
night, Black and Donaldson drove to Donaldson's friend's house to pick up some clothes. They then returned home. Black testified that they were gone from the home for about an hour and a half. Black testified that from the time he picked her up from work until they went to bed that night, Donaldson was "[b]y my side." She confirmed that initially after the incident, she accused Donaldson of committing the crime. Black testified that in 2003 she had pled guilty to and been convicted of forgery. She further admitted to pleading guilty to aggravated trafficking in drugs. Black agreed forgery was a crime of dishonesty. Black further testified that she was currently pregnant with Donaldson's child. Black confirmed that on a recorded jailhouse call she told Donaldson that "If you went there in my car, I'm gonna beat your ass." She further confirmed that she said on the tape that she would beat up Roberts. Also on the tape, Black reminded Donaldson that he "had my car Monday because you went to Ed's." Donaldson confirmed, "Yeah, and I was at Ed's." This conversation contradicts Black and Mattocks' testimony that Donaldson went to a friend's house with Black to get some clothes. Finally, when Donaldson asked Black what he should do about getting out of prison, she stated "I'd start making up shit."
 {¶ 24} The jury heard testimony from Donaldson. Donaldson testified that on August 20, 2007, he was at Black's home. He explained that on the morning of August 20, he and Black took her son to day care. Donaldson testified that he then took Black to Akron to pick up some medication that she needed to take to a client at work. Donaldson testified that he then took Black from Akron to Aurora, Ohio. Donaldson stated that he left Aurora around 2:00 p.m. and went back to Black's house, where he stayed for an hour. According to Donaldson, he left Black's house to return to Aurora to pick up Black. On the way, he stopped to visit a friend at work. He picked Black up at approximately 4:40 p.m. On the way home from Black's work, Black and Donaldson stopped at a restaurant. Then they went back to Black's home where they *Page 12 
stayed for a while. Donaldson stated that around 6:30 p.m., he and Black went to his friend Dwight's house to pick up some clothes. He stated that he had been staying at Dwight's home. Donaldson stated that he and Black visited at Dwight's home. According to Donaldson, after they left Dwight's house, they went back to Black's house and watched some movies. Donaldson testified that they arrived at Black's home at 8:30 p.m. He testified that he spent the night at Black's home. When asked if he could have gone anywhere near Roberts' home on August 20, 2007, Donaldson answered "[n]o, no, sir. Absolutely not." He denied having been on her property on the night in question. He further denied encouraging Black to lie for him. He testified that in the jailhouse call he was confused about what day he had gone to Ed's. He explained that he and Black were confused about the events and when they occurred. He stated that he "mixed some of the things that happened Monday with Tuesday."
 {¶ 25} Donaldson denied Roberts' allegations that he had been in her home on January 31, 2007. He further denied Roberts' allegations that he called her on January 13th, 2007. He stated that he had not "had any contact with Laura Roberts since July 16th, 2006." Donaldson explained that as a result of the January 13, 2007 incident, a probation violation hearing was held, but that "they threw it out. They found me not guilty. But they violated me for missing a meeting with my probation officer on January the 12." Donaldson testified that he pled not guilty to violating the protection order by calling Roberts on January 13, 2007.
 {¶ 26} Donaldson admitted that he had called Roberts on July 16, 2006. However, he denied that he told her that he had been in her house that day. According to Donaldson, he was at Oriana house. He denied threatening Roberts.
 {¶ 27} With regard to the incident that occurred in May of 2006, Donaldson testified that he did not break into the house because he had keys. He admitted that he hit her, but stated that *Page 13 
he "immediately apologized for that." However, Donaldson testified that Roberts asked him to stay and talk with her. He later testified that he grabbed her arm. It does not become clear until cross-examination that Donaldson was testifying as to two separate instances. According to Donaldson, the initial incident occurred on May 6, 2006 and was prior to Roberts getting the CPO. Roberts got a CPO on May 9, 2006. He stated that the initial incident, when he hit her, was an accident. The second instance, when he grabbed her arm, occurred on May 17, 2006. As a result of this incident, Donaldson was convicted of domestic violence. He verified that he and Roberts had gone to dinner together after the CPO was issued.
 {¶ 28} On cross-examination, Donaldson testified that he assumed that Roberts had cheated on him during their relationship. He further testified that he had cheated on Roberts. He testified that he was aware that a 14-year-old girl had accused him of having sex with her on numerous occasions. However, he denied the allegations. He did admit that he called the 14-year-old girl several times. He explained that this occurred between December of 2005 and March of 2006.
 {¶ 29} The State questioned Donaldson with regard to his statement that he was found not guilty of calling Roberts on January 13, 2007. He stated that Roberts testified against him at the probation violation hearing. He conceded that he had no documentation that said he had been found not guilty of violating the CPO by calling Roberts. The State question Donaldson, "In point in fact after that hearing you went to the penitentiary to serve the rest of your sentence, did you not?" Donaldson affirmed that he was sent to prison for a parole violation.
 {¶ 30} The State inquired of Donaldson, "So when you are upset, you hit people?" Donaldson replied, "when I feel like I'm-as much as I've been through in the last year, it's — it's — yeah." He testified that when he lived in Roberts' home there was no security system and *Page 14 
the windows were not nailed shut. According to Donaldson, Roberts has been lying. When asked if he thought Mattocks was honest, Donaldson responded "I don't know." He then clarified that she was honest "[a]s far as this is concerned, absolutely, yes, ma'am." He further testified that he agreed that Roberts believed that he or someone on his behalf had been inside her home on July 16, 2006.
 {¶ 31} The State questioned Donaldson with regard to an incident that occurred on September 10, 1992 where a former girlfriend alleged that he threatened her and three other girls. Donaldson denied that the incident occurred. The State presented Donaldson with an Akron Municipal Court record saying that he pled guilty to menacing and criminal trespass. Donaldson initially denied that the court document was referring to him, but later agreed with the prosecutor that he "was convicted of menacing and criminal trespass[.]" He further admitted that he was ordered to stay away from his former girlfriend. Donaldson verified that on October 21, 1992, he pled guilty to another criminal trespass charge against the same ex-girlfriend. He verified that "the sentence that was suspended against [him] was later imposed because [he] had two more complaints against [him] for trespassing [at the same location] on November 4th and December 1st of 1992[.]" He further testified that he pled no contest to, and was found guilty of, assaulting a police officer and resisting arrest on December 1, 1992. Donaldson testified that his former girlfriend "had to have" made up the 1992 allegations against him.
 {¶ 32} Donaldson further indicated that on February 7, 2000, he pled guilty to assault on a police office. He further testified that on August 25, 2001, while dating Roberts, he pled guilty to threatening a clerk at a drive-through. Roberts was with him at the time of the incident.
 {¶ 33} From the evidence presented, we find that that the jury verdict convicting Donaldson of violating a protection order and menacing by stalking was not against the manifest *Page 15 
weight of the evidence. Roberts testified to the many instances that Donaldson appeared at her house and called her. We find that the State presented evidence that would indicate that Donaldson had engaged in at least two or more actions between January of 2006 and August 20, 2007 that would indicate a pattern of conduct with respect to R.C. 2903.211. We further note that Roberts testified that she was afraid of Donaldson, so much so that she nailed her windows shut and had a home alarm system installed. Finally, we note that the parties stipulated to a prior conviction of aggravated assault in violation of R.C. 2911.211. Accordingly, the menacing by stalking charge was a fourth degree felony.
 {¶ 34} Donaldson's sole argument with regard to the menacing by stalking charge was that "the only clearly proven instance was the domestic violence conviction from May 2006. All other instances that the State relied upon were alleged by Ms. Roberts only and no supporting evidence was propounded." With regard to Donaldson's argument on appeal, a jury was entitled to believe Roberts' testimony as to the incidents. Upon reviewing the entire record, we have weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses.Often, 33 Ohio App.3d at 340.
 {¶ 35} Specifically, we note that both of Donaldson's witnesses had criminal records that indicate dishonesty. We also note jailhouse calls that indicate that the witnesses were not forthright with their testimony. Further, we point out that Black was pregnant with Donaldson's child at the time of trial, thus tending to prove that she had a bias towards Donaldson's release. As such, we cannot find that the jury clearly lost its way when it convicted Donaldson of menacing by stalking.
 {¶ 36} We further do not find that the jury lost its way when it convicted Donaldson of violating a protection order. Roberts testified to the CPO that she obtained ordering Donaldson *Page 16 
to have no contact with her. She further testified that she saw him at her back door on August 20, 2007. Further, we find that both Roberts and Donaldson testified that he had previously been convicted of violating a protection order. Accordingly, we find that Donaldson's convictions were not against the manifest weight of the evidence. As we have disposed of his claim regarding the manifest weight of the evidence, we similarly dispose of his sufficiency argument. See Roberts, supra. Donaldson's assignments of error are overruled.
 ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED IN PERMITTING [THE STATE] TO PRESENT OTHER ACT TESTIMONY FROM WITNESSES BECAUSE SUCH TESTIMONY SHOULD HAVE BEEN EXCLUDED PURSUANT TO EVID.R. 401, EVID. R. 402, EVID.R. 403, EVID.R. 404(B) AND R.C. 2945.59[.]"
 {¶ 37} In his third assignment of error, Donaldson contends that the trial court erred in permitting the State to present other act testimony from witnesses because such testimony should have been excluded pursuant to Evid. R. 401, Evid. R. 402, Evid. R. 403, Evid. R. 404(B) and R.C. 2945.59.
 {¶ 38} Specifically, Donaldson argues that there were several occasions where other acts testimony was introduced in order for the prosecution to prove a pattern of conduct. He does not, however, cite this Court to the relevant portion of the record, nor state what specific occasions to which he objects. See App. R. 16. "If an argument exists that can support [Appellant's contentions], it is not this court's duty to root it out." Cardone v. Cardone (May 6, 1998), 9th Dist. No. 18349, at *8. Further, Donaldson argues that:
 "the prosecution discussed other irrelevant specific acts during her cross-examination of Mr. Donaldson. Since the prior aggravated trespass was already stipulated to there was no need to get into the facts surrounding the incident. In addition, the prosecution should not have been permitted to ask Mr. Donaldson about his charges for Aggravated Assault in Portage County. (TR at 674). These questions were of no relevance and were far more prejudicial then probative of the facts necessary to the case at bar. The prosecution should not have been *Page 17 
permitted to explore these fact patterns as there was no relation to even attacking t[he] character of Mr. Donaldson."
 {¶ 39} For this portion of his argument, Donaldson only provides one citation to the record, which points this court to his cross-examination regarding an earlier conviction for aggravated assault. Our review of the sole citation Donaldson provided reveals that he did not object to the State's line of questioning regarding his conviction for aggravated assault during his cross-examination. He further argues that testimony of a witness from pretrial release services was irrelevant. However, upon review, we again note that he failed to object to this testimony at trial.
 {¶ 40} The Ohio Supreme Court has "long recognized, in civil as well as criminal cases, that failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal." Goldfuss v. Davidson (1997),79 Ohio St.3d 116, 121. However, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court[.]" Id., quoting Crim. R. 52(B). We must note the distinction between the waiver of an objection and the forfeiture of an objection. Although the terms are frequently used interchangeably,
 "`[w]aiver is the intentional relinquishment or abandonment of a right, and waiver of a right cannot form the basis of any claimed error under Crim. R. 52(B). On the other hand, forfeiture is a failure to preserve an objection[.] * * * [A] mere forfeiture does not extinguish a claim of plain error under Crim. R. 52(B).'" (Internal citations and quotations omitted.) State v. Payne, 114 Ohio St.3d 502, 2007-Ohio-4642, at ¶ 23.
 {¶ 41} Therefore, where a party has forfeited an objection by failing to raise it, the objection may still be assigned as error on appeal if a showing of plain error is made. State v. Hairston, 9th Dist. No. 05CA008768, 2006-Ohio-4925, at ¶ 9; Crim. R. 52(B). However, Donaldson has neither argued plain error, nor has he explained why we should delve into these *Page 18 
issues for the first time on appeal. Moreover, in our disposition of Donaldson's first and second assignments of error, we found that his conviction was supported by the manifest weight of the evidence. Accordingly, we decline to address these issues. Donaldson's third assignment of error is overruled.
 III. {¶ 42} Donaldson's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
 Costs taxed to Appellant. *Page 19 
 SLABY, J., WHITMORE, J., CONCUR *Page 1